<pre>
 1                 UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 2                        MIAMI DIVISION

 3            CASE NUMBER 11-60265-CV-MORENO/BROWN

 4   RICHARD B. MAYER,                 ATKINS BUILDING

 5            Plaintiff,               MIAMI, FLORIDA

 6       vs.

 7   WALL STREET EQUITY, INC., ET AL.,    OCTOBER 7, 2011

 8            Defendants.             {Pages 1 - 66}
     ─────────────────────────────────────────────────────
 9
          EVIDENTIARY HEARING ON MOTION FOR ATTORNEY FEES
10              AND REASONABLE LITIGATION EXPENSES
              BEFORE THE HONORABLE STEPHEN T. BROWN
11               UNITED STATES MAGISTRATE JUDGE

12   ─────────────────────────────────────────────────────

     APPEARANCES:
13
     FOR THE PLAINTIFF:
14                            ROBERT SCOTT NORELL, ESQ.
                              Robert S. Norell, P.A.
15                            7350 NW 5th Street
                              Plantation, FL  33317-1605
16                            T: 954.617.6017; F: 954.617.6018
                              robnorell@aol.com
17
     FOR THE DEFENDANTS:
18                            A. MARGARET HESFORD, ESQ.
                              A. Margaret Hesford, P.A.
19                            10950 Stirling Road
                              Davie, FL  33328
20                            T: 954.880.0257; F: 954.252.8516
                              amhpa@earthlink.net
21
     REPORTED BY:
22                            JILL MICHELLE HARDY-HOBBS, CCR, FPR
                              Official United States Court Reporter
23                            400 North Miami Avenue, Suite 08S33
                              Miami, FL  33128    T: 305.523.5022
24                            jill_hardy-hobbs@flsd.uscourts.gov

25
</pre>

1                    **INDEX TO EXAMINATION OF WITNESSES**

2                                                                    **PAGE**

3    **ROBERT SCOTT NORELL**.............................       6

4         Cross-examination by Ms. Hesford.............       8

5    **RICHARD MAYER**...................................      19

6         Direct examination by Ms. Hesford............      19

7         Cross-examination by Mr. Norell..............      31

8         Redirect examination by Ms. Hesford..........      47

9    **STEVEN WEST**.....................................      49

10         Direct examination by Ms. Hesford............      50

11         Cross-examination by Mr. Norell..............      54

12         Redirect examination by Ms. Hesford..........      62

13

14

15

16

17

18

19

20

21

22

23

24

25

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1    **(Call to the order of the Court)**

2           **THE COURT:**  Please be seated.

3           **THE COURTROOM DEPUTY:**  Richard Mayer versus Wall

4    Street Equity Group, Inc., et al., Case Number

5    11-60265-Civil-Moreno.

6           **THE COURT:**  Counsel, state your appearances for the

7    record, please.

8           **MR. NORELL:**  I'm Robert Norell for the -- really for

9    myself, Your Honor.

10          **THE COURT:**  Okay.

11          **MS. HESFORD:**  Good afternoon, Judge.  Margaret Hesford

12   and Margaret Hesford, P.A., counsel for both defendants.

13          **THE COURT:**  All right.  Mr. Norell, it is your motion.

14          **MR. NORELL:**  Thank you, Your Honor.  Yes, it is my

15   motion.

16          **THE COURT:**  Let me say this:  I have read all of these

17   materials.  Okay?  To the extent that you want to rely on what

18   you have filed in this case, I don't want you to regurgitate

19   that.  That's going to waste everybody's time.  Okay?  But

20   since this is an evidentiary hearing if you wish to rely on

21   your verified motion, et cetera, I am going to substitute

22   cross-examination just like any other witness; but you don't

23   have to repeat all that.  Likewise, by the way, the same is

24   true for the defense.

25          **MS. HESFORD:**  Thank you, Judge.

October 7, 2011

1       **THE COURT:**  Go ahead, sir.

2       **MR. NORELL:**  I was just going to talk about that, Your

3    Honor, because this is -- although it's my motions, this is the

4    defendant's request for an evidentiary hearing.  I would just

5    rest on the well-documented and well-supported motion that's

6    already been filed.

7            I have filed probably close to 40 or 50 motions for

8    attorney's fees, yet this is the first ever evidentiary hearing

9    I've had concerning my fees.  So it's not something I

10   requested.  I'm happy to subject myself to cross-examination.

11           As far as I understand, the defendant's position is

12   that, A, I'm not entitled to fees because I'm not the

13   prevailing party and there was no overtime owed.  And if I am

14   entitled to fees, there's a -- they've basically just opposed

15   one entry on March the 22nd on the basis of, A, it didn't happen

16   and, B, it was double billing.

17           They have not contested my rate that I requested at

18   $350 an hour nor have they requested the other 14.3 hours that

19   I have in the case and 8.75 hours that my associate at that

20   time, Jon Kreger had in the case.  So really I don't really

21   have much more to add, Your Honor.

22       **THE COURT:**  Okay.

23       **MR. NORELL:**  I mean I feel the motion's

24   well-documented.

25       **THE COURT:**  You've said that.

October 7, 2011

1      **MR. NORELL:**  And I think if you did review all of the

2  filings in the case, then I'm happy to give you a brief opening

3  on the way I see the case; but you're shaking your head no, and

4  I --

5      **THE COURT:**  Again, I don't want you to regurgitate.

6      **MR. NORELL:**  Okay.

7      **THE COURT:**  I've read everything in this file.

8      **MR. NORELL:**  Okay, Your Honor.

9      **THE COURT:**  Now, as far as the defense is concerned,

10  do you wish to cross-examine Mr. Norell?

11     **MS. HESFORD:**  Yes, Your Honor.  And if I may just

12  clarify the record.  Mr. Norell misspoke.  We did not ask for

13  an evidentiary hearing.

14     **THE COURT:**  It doesn't matter who asked for it.

15     **MS. HESFORD:**  The Judge ordered it.

16     **THE COURT:**  I did.  Okay?

17     **MS. HESFORD:**  Yes, you did, Judge.

18     **THE COURT:**  That's good enough.

19     **MS. HESFORD:**  Yes, sir.

20     **THE COURT:**  Now, do you wish to cross-examine Mr.

21  Norell?

22     **MS. HESFORD:**  Yes, sir.

23     **THE COURT:**  Okay.  Stef, put Mr. Norell under oath,

24  please.

25     **THE COURTROOM DEPUTY:**  Do you want him to be over at

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1   the microphone?

2   **THE COURT:**  He can be over there at the microphone.

3   **THE COURTROOM DEPUTY:**  Okay.

4   **THE COURT:**  Put him under oath.

5   **THE COURTROOM DEPUTY:**  Raise your right hand.

6   **<u>ROBERT SCOTT NORELL, SWORN.</u>**

7   **THE COURTROOM DEPUTY:**  Please state your full name for

8   the record and spell your last name.

9   **MR. NORELL:**  Robert S. Norell, N-o-r-e-l-l.

10   **THE COURT:**  And you can be seated, sir.  Just speak

11   into the microphone.  Go ahead, sir.

12   **MS. HESFORD:**  Judge, do you want me to -- Ms. Hesford.

13   **THE COURT:**  Ms. Hesford.

14   **MS. HESFORD:**  No problem.  Do you want me to sit here

15   or can I stay at counsel's table?

16   **THE COURT:**  You may sit anywhere or stand anywhere as

17   long as you're at a microphone.

18   **MS. HESFORD:**  I appreciate that, Judge, because I have

19   papers and it's easier to do them from here.  Thank you so

20   much.

21   **MR. NORELL:**  Your Honor, one issue before I begin.

22   Mr. Mayer although he was formerly my client is basically

23   adverse to me at this point.  He is going to be a witness in

24   this case.

25   **THE COURT:**  I understand where you're going with this,

October 7, 2011

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1   and I think that's a good point.  Let me ask the question of my

2   IT experts here.  Can we turn this -- you turn this off for the

3   witness and then bring him back in?

4          **IT TECHNICIAN:**  Yes, Your Honor.

5          **THE COURT:**  Can we do that?

6          **IT TECHNICIAN:**  We can mute the video and the audio,

7   Your Honor.

8          **THE COURT:**  Okay.  Please.  That is where you were

9   going, correct, Mr. Norell?

10         **MR. NORELL:**  It was, Your Honor.  Thank you.

11         **THE COURT:**  Okay.

12         **IT TECHNICIAN:**  Would it be okay just to mute the

13  audio or both, Your Honor?

14         **THE COURT:**  I think if you just mute the audio so he

15  doesn't -- we don't hear him and he don't hear us.  Then we're

16  fine for now.

17         Mr. Mayer, can you hear me?  Oh, no, you already muted

18  it.

19         **MS. HESFORD:**  Yeah.  He's gone.  He's there, but he's

20  muted I think, Judge.

21         **IT TECHNICIAN:**  Both are muted.

22         **MS. HESFORD:**  Okay.

23         **IT TECHNICIAN:**  Both are muted, Your Honor.

24         **THE COURT:**  Pardon?

25         **IT TECHNICIAN:**  Both are muted, Your Honor.

October 7, 2011

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1     **THE COURT:**  We're muted now?

2     **IT TECHNICIAN:**  Yes, Your Honor.

3     **THE COURT:**  Okay.  Then let's proceed, please.

4     **MS. HESFORD:**  Thank you, Judge.

5                    **CROSS-EXAMINATION**

6     **BY MS. HESFORD:**

7     Q.  Mr. Norell, when Mr. Mayer came to see you, wasn't his

8     first comment, Shouldn't we call Mr. West, Steve, and see if we

9     can settle this?

10    A.  When he first came to see me?

11    Q.  Yes.

12    A.  I never met him in person.

13    Q.  I'm sorry.  That's -- you said when he first came to see

14    you, you never met him.  That sentence doesn't make sense.

15    It's a contradiction.  Can you explain that, please.

16         **THE COURT:**  He said he never met him in person.

17         **MS. HESFORD:**  Well, my comment -- all right.  Let me

18    try rephrasing.  I'm still confused.

19    **BY MS. HESFORD:**

20    Q.  Tell the Court how you first met Mr. Mayer.

21    A.  The first time I spoke with Mr. Mayer was probably a few

22    days after he had signed up -- was signed up as a client by my

23    staff.  He had -- he had wanted to file this -- he wanted us to

24    file this case as soon as possible.  So the reason that I had

25    to speak with him is because he was upset that his case was not

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1    yet filed.  So the answer to your question about calling --

2    about him requesting that I reach out to the defendant didn't

3    happen.  Absolutely did not happen.

4    Q.  You said he was signed up as a client by your staff so he

5    didn't speak to an attorney before he was -- before you

6    retained him as a client -- excuse me -- before he retained you

7    as his counsel?

8    A.  I don't know what other attorneys he may have spoken to;

9    but in terms of coming into my office, he met -- he met with my

10   staff.  My staff is -- my paralegals are trained to identify

11   issues.  I oversee them.  In fact, on this case I specifically

12   --

13          MS. HESFORD:  Judge, forgive me.  It was a really

14   simple question.  I'm getting a really long answer.

15          THE COURT:  I agree with you.  I don't need narrative

16   answers, Mr. Norell.

17          MR. NORELL:  Okay.

18          THE COURT:  Just answer the question.

19          MR. NORELL:  Okay.

20   BY MS. HESFORD:

21   Q.  The question was:  Are you telling this Court that Mr.

22   Mayer was signed up as a client without meeting with an

23   attorney?  It seems like the answer is yes.

24   A.  The answer is yes.

25   Q.  Okay.  Who did he sign up with specifically?  I don't need

October 7, 2011

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1  everything that took place, but let's start with who did he

2  meet with specifically?

3  A.  He met with -- he met with my paralegal Nancy Piloto.

4  Q.  And I assume you only know that because she told you?

5  A.  Yes.

6  Q.  How many -- what do you -- well, you don't know about.

7  It's hearsay.  So at this point are you relying on Ms. Piloto's

8  sworn declaration?

9  A.  As far as what?

10  Q.  Well, as far as what took place because you've made

11  numerous allegations in your motion and in your reply, and I'm

12  not going to repeat all this.  I'm basically drawing the

13  Judge's attention to it; but you said that Ms. Piloto --

14  according to you Ms. Piloto said that plaintiff inquired many

15  times as to the status of his case.

16         **MS. HESFORD:**  Judge, on the top motion -- actually I

17  don't know if you have this, Judge.  This is our motion for

18  rehearing of the order denying our motion for attorney's fees.

19         **THE COURT:**  Okay.

20         **MS. HESFORD:**  That you may not have.  Is that

21  something that you can access in due course?

22         **THE COURT:**  Yes.

23         **MS. HESFORD:**  Okay.  This is docket entry 35.

24         **THE COURT:**  Okay.  Go ahead.

25  **BY MS. HESFORD:**

October 7, 2011

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1   Q.  And at footnote 7 you cited to your assistant's declaration

2   that he inquired -- that Mr. Mayer inquired many times about

3   the status of his case and about completing paperwork, et

4   cetera, et cetera; but, in fact, the declaration did not

5   support that.  The declaration was in very general terms, not

6   in specific terms and; moreover, you weren't present, were you,

7   so you can't say what it was?

8           THE COURT:  Is that a question?

9           MS. HESFORD:  Yes.  I apologize.

10  BY MS. HESFORD:

11  Q.  You weren't present when Ms. Piloto had these alleged

12  conversations, were you?

13  A.  I was not present when she had those conversations.

14  Q.  Did you at any point in this litigation reach out to the

15  defense to try and settle it?

16  A.  No.

17  Q.  Why?

18  A.  Because -- because I didn't.

19  Q.  Why?

20  A.  Typically I don't.  There's no requirement for me to do

21  that.  In certain situations where I may know who represents

22  the defendant, I may reach out or if I've had a case against

23  the defendant before, I may reach out.  But, you know, these

24  cases -- people come to me with issues that, you know, once an

25  attorney gets involved especially when they're still working

1  there, the landscape changes considerably.  And all of that was

2  explained to Mr. Mayer.

3  Q.  By whom?

4  A.  By my staff.

5  Q.  So you don't know what was explained to him, do you, sir?

6  A.  I know what was explained to him because I spoke to my

7  staff about it.

8  Q.  Mr. Norell, you weren't present, were you?

9  A.  I was not present.

10 Q.  Therefore, you are assuming what took place based on what

11 your staff told you was their recollection; isn't that true?

12 A.  I am relying upon what my staff has reported to me.

13 Q.  Okay.

14      MS. HESFORD:  And in that regard, Judge, so as not to

15 take extra time, I'll just refer you in detail to that motion

16 for re-hearing.

17      THE COURT:  Okay.

18 BY MS. HESFORD:

19 Q.  How much was the settlement in this case, Mr. Norell?

20 A.  It was reported to me by Mr. Mayer that it was somewhere

21 around $900.

22 Q.  And how much are you seeking in attorney's fees today?

23 A.  I'm seeking attorney's fees through just May the 17th of

24 $6,755.

25 Q.  And beyond that what are you claiming you're owed in this

1   case?

2   A.   There will be a supplemental motion that will be filed, and

3   it's approximately -- probably another 5 or $6,000 in fees

4   that's been generated that at some point I hope to ask the

5   Court to award to me.

6   Q.   So in a case where there was $900 at stake that was settled

7   between the parties immediately almost after the scheduling

8   order was entered, you've managed to take -- to run this case

9   to $13,000 worth of fees when you could have settled it for

10  $900; isn't that true?

11  A.   Well, first of all --

12  Q.   Yes or no, sir?

13  A.   No, it's not true.  It's not true.  Because this case came

14  to me with very clear pay records with a very clear

15  wage-and-hour violation on the records where we completed some

16  damage calculations based on the actual pay records which

17  demonstrated at least 15 to $1600 in unpaid overtime that was

18  due.  Liquidated damages would have brought the claim to

19  probably just under $3,000.

20  Q.   Now, Mr. Norell, isn't it true that liquidated damages is

21  only paid if there's a willful violation?

22  A.   That's not true.  You're mistaken.  That's -- that's --

23  liquidated damages --

24  Q.   You're --

25          THE COURT:  Hold it.

October 7, 2011

Evidentiary hearing on attorney's fees and reasonable litigation expenses

 1          **MS. HESFORD:**  Excuse me.

 2          **THE COURT:**  You're arguing over a question of law.

 3          **MS. HESFORD:**  We are.

 4          **THE COURT:**  That's not --

 5          **MS. HESFORD:**  We are.  Thank you, Judge.

 6   **BY MS. HESFORD:**

 7   Q.  But -- so essentially even based on your computations

 8   there's $1500 at stake and you've got about $13,000 in

 9   attorney's fees.  Doesn't it seem to you it would have been a

10   reasonable thing to do to try and reach out to the defense and

11   try and settle this case?

12   A.  Well, I tell you what, had I known what positions you have

13   taken and your client has taken I probably would have never

14   taken the case because this has been a complete and utter

15   nightmare.  And hindsight is 20/20, Ms. Hesford; but your

16   client should have reached out.  You should have reached out

17   early on and settled this case rather --

18          **MS. HESFORD:**  Move to strike.

19          **MR. NORELL:**  -- rather than doing it behind my back.

20          **MS. HESFORD:**  Judge, I move to strike as

21   nonresponsive.  And, Judge, I would appreciate it if you'd

22   admonish Mr. Norell.  He's made these allegations, if Your

23   Honor has read the papers, throughout this case that I did

24   something improper.  The plaintiff and the defendant, Mr. West

25   and Mr. Mayer, got together and settled this and expected --

October 7, 2011

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1      THE COURT:  Unless you're going to testify under oath

2  I don't need the colloquy.  It's already in the record.  I've

3  read the record.  Let's move on.

4      MS. HESFORD:  If Your Honor requires, I will be glad

5  to testify.  If you've taken it from the record, I'm okay with

6  that too.

7  **BY MS. HESFORD:**

8  Q.  Do you know where Mr. --

9      THE COURT:  Let's move on.

10      MS. HESFORD:  I'm sorry.

11      THE COURT:  Go ahead.

12  **BY MS. HESFORD:**

13  Q.  Do you know where Mr. Mayer is now?

14  A.  I believe he's in New York.

15  Q.  You know he's in New York, don't you, Mr. Norell?

16  A.  I just answered your question.  I believe he's in New York.

17  Q.  Haven't you called him?

18  A.  I did.

19  Q.  Didn't you, in fact, call him and tell him that this was

20  going to be difficult and embarrassing and he shouldn't

21  testify?

22  A.  Absolutely not.

23  Q.  So if he says you did, you're telling the truth and he's

24  not?

25  A.  He's lying if he said that.

October 7, 2011

1   Q.  And why is he lying and you're not?

2   A.  Because I'm --

3           THE COURT:  Okay.  Don't answer that question.

4           MS. HESFORD:  Okay.

5           THE COURT:  Move on.

6   BY MS. HESFORD:

7   Q.  Did you ever talk to Mr. Mayer about references; that if he

8   lost this job about the potential for having a problem getting

9   a reference for another job?

10  A.  Did I ever speak to him about it personally?  No.

11  Q.  Did anybody -- do you, hearsay, know of anybody that did?

12  Now, what I mean by that is you said that your staff said

13  things that you weren't present for; therefore, that would be

14  hearsay.  But you do know of anybody?

15  A.  I know of somebody who definitely talked to Mr. Mayer about

16  that very issue.

17  Q.  And who was that?

18  A.  My assistant.

19          MS. HESFORD:  And, again, Judge, I'd refer you to the

20  motion for re-hearing on Ms. Piloto's sworn statement.

21          MR. NORELL:  It's Piloto.

22          MS. HESFORD:  Piloto.  I apologize, Ms. Piloto.  I

23  apologize.

24  BY MS. HESFORD:

25  Q.  Do you know what he's doing now, Mr. Mayer?

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1  A.  Do I know what he's doing?

2  Q.  As far as work.

3  A.  The last -- when I spoke with him a couple of weeks ago, I

4  believe he told me he was unemployed.

5  Q.  So it's your testimony that Mr. Mayer told you he was

6  unemployed?

7  A.  That's my recollection.  I'm not -- I'm not a hundred

8  percent sure, but I think he told me he was unemployed.

9  Q.  Okay.  Well, we'll get that from Mr. Mayer in due course.

10  Have you -- do you have any information at this point that he's

11  not unemployed?

12  A.  I have no other information than what I just testified to.

13  Q.  So you don't know that he's now driving a taxi seven days a

14  week?

15  A.  I don't know that.

16  Q.  And you didn't personally tell him that in the event of

17  this litigation he could have a problem getting a reference to

18  get another job?

19  A.  I did not personally tell him that.

20  Q.  Okay.

21  MS. HESFORD:  One moment, Judge.  All right.  Judge, I

22  have no further questions at this point.

23  THE COURT:  Okay.  Other than what is already in the

24  record, Mr. Norell, is there anything you wish to add since you

25  are under oath and on, quote, unquote, on the stand as a result

1  of your cross that would be sort of kind of redirect?

2        **MR. NORELL:**  Well, Your Honor, I guess what I'll do is

3  I'll remain under oath and depending on what Mr. Mayer's

4  testimony is I might have something to add.

5        **THE COURT:**  Okay.  Fair enough.  From the standpoint

6  of presentation of your claim, is there anything further you

7  wish to put on the record at this time?

8        **MR. NORELL:**  No.  I just want to clarify that in

9  addition to the $6,755 in attorney's fees, there's costs of

10  $440.

11        **THE COURT:**  Okay.  Now we will turn then to the

12  defense case; and let's start with the witness, Mr. Mayer.

13        **MS. HESFORD:**  Thank you, Judge.

14        **THE COURT:**  Mr. Mayer, can you hear me?

15        **MR. MAYER:**  Yes.

16        **THE COURT:**  Good.  Thank you, sir.  We are going to

17  take your testimony now, and then you're going to be able to

18  get out of wherever it is you are, sir.

19        Would you please stand up.  Do we have somebody that

20  can put Mr. Mayer under oath?  Do you do it, Stef, or do they

21  do it there?

22        **THE COURTROOM DEPUTY:**  Do they have someone there?

23        **MS. HESFORD:**  Yes, they do.

24        **MR. MAYER:**  Yes.  I am here.

25        **THE COURT:**  Okay.  Is somebody there going to put Mr.

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1  Mayer under oath?

2          MR. BROBUDO:  Yes.

3          THE COURT:  Please do.

4          MR. BROBUDO:  My name is Joe Brobudo (sp).

5          THE COURT:  And who are you, sir?

6          MR. BROBUDO:  Do you solemnly and sincerely -- my name

7  is Joe Brobudo.  I'm a notary public in the State of New York.

8          THE COURT:  Okay.  Go ahead, sir.

9                    **RICHARD B. MAYER, SWORN.**

10         MR. BROBUDO:  State your name.

11         MR. MAYER:  Richard Mayer.

12         MR. BROBUDO:  Spell your last name.

13         MR. MAYER:  M-a-y-e-r.

14         THE COURT:  Okay.  Ms. Hesford, you may inquire.

15         MS. HESFORD:  Thank you, Judge.

16                    **DIRECT EXAMINATION**

17  BY MS. HESFORD:

18  Q.  Hi Richard.  How are you?

19  A.  Hello.

20  Q.  Hello.

21  A.  Well.

22  Q.  Good.  If I may -- and obviously you're here listening to

23  this.

24         MS. HESFORD:  Judge, are we assuming that everything

25  in the record, all the affidavits and stuff, we don't need to

October 7, 2011

1   regurgitate all those?

2           **THE COURT:**  No.  I'll do the same thing.  Mr. Norell,

3   you can cross on those if you want; but to the extent that

4   there are sworn documents in the record, I will allow you all

5   to proceed with all -- let me make it simple.  All sworn

6   documents in the record whether they be germane -- rephrase --

7   whether they have been filed in relation to this motion or in

8   relation to some other motion, i.e., docket entry 35, will be

9   considered by the Court unless I hear an objection from either

10  side.  Okay?

11          **MS. HESFORD:**  Thank you, Judge.

12          **THE COURT:**  Which I need y'all to consider now.

13          **MS. HESFORD:**  Okay.  I appreciate it.  And actually,

14  Judge, I don't know how -- I know how long we have scheduled

15  for this, but I would appreciate the opportunity to supplement

16  what Your Honor is considering by looking at the other items in

17  the record.

18          And I can either sit and do that when we're done or I

19  can subsequently contact the Court and say, Would you please

20  consider docket entries whatever because there were two motions

21  for attorney's fees as Your Honor probably knows, both sides.

22          And I believe the filings that we have made -- I think

23  in a blanket sense if Your Honor looked at everything on

24  attorney's fees, both sides, through the motion for

25  reconsideration, that would probably cover it.

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1  **THE COURT:**  Okay.  Here's what I'm going to do:  No.
2  I'm not going to waste your time or mine at this time; however,
3  I will give you till let's just say next Wednesday --
4  **MS. HESFORD:**  Okay.
5  **THE COURT:**  -- to do a notice of filing and ask the
6  Court to consider the following docket entry numbers.  I want
7  no arguments.  I want no explanations.  Just to cite to the
8  docket entry numbers.
9  And, Mr. Norell, the same applies to you if it's
10 applicable.
11 **MS. HESFORD:**  That would be fine.  Thank you very
12 much, Judge.
13 **BY MS. HESFORD:**
14 Q.  Richard, when you first went to Mr. -- well, let me strike
15 that.  How did you come to know Mr. Norell?
16 A.  Internet.
17 Q.  Did you do some kind of internet search for an attorney?
18 A.  Yes.
19 Q.  And who did you speak to first?
20 A.  A woman.  I don't remember her name.  I believe it was one
21 of his office people.
22 Q.  Okay.  What did you tell that lady back then, your best
23 recollection?
24 A.  That I was interested in finding an attorney to help me
25 with matters concerning Steve West.

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1   Q.  Okay.  In that conversation did you ask whether somebody

2   could call Mr. West to see if you could settle this?

3           MR. NORELL:  Objection.

4           THE COURT:  Sustained.  Don't lead the witness.

5   BY MS. HESFORD:

6   Q.  Tell the Judge what you told them during that conversation.

7   A.  It was a -- it was information.  I mean it started back --

8   I explained to him my whole work relationship with Steve; that

9   for quite some time we had an excellent relationship.  I

10  considered him my friend at one point, and then something came

11  up concerning money; and I wanted their advice on how I should

12  handle the situation.

13  Q.  So is it fair to say you weren't looking to file a lawsuit

14  at that point?

15          MR. NORELL:  Objection.

16          THE COURT:  Again, let's not lead the witness.

17          MS. HESFORD:  Okay.

18          THE COURT:  I'm not going to say it again.

19  BY MS. HESFORD:

20  Q.  What was your -- you said your intent was to find out --

21  tell me again.

22  A.  My first -- my first intent was to get information and see

23  if there was any advice that they could give to me on how to

24  handle the situation I had with Steve West.  Speaking to I

25  guess his secretary -- I really don't know what her work title

October 7, 2011

1    is -- she informed me what Mr. Norell does for a living and

2    what his capabilities are to pursue the matter of monies that I

3    thought were owed to me at the time.

4    Q.   When you say she told you what he could do, what his

5    qualifications were and what he could do to get you the money

6    owed, could you be a bit more specific?

7    A.   Well, she told me that he was an attorney and that he works

8    with labor compensation type work.  And she told me that that's

9    what he does, and that fit the scheme of what I was looking to

10   do.

11   Q.   So at that -- when did -- did you speak to him on that

12   occasion or was that at another time?

13   A.   I had not spoken to Mr. Norell for approximately a month.

14   Q.   I'm sorry.  We didn't catch that.

15   A.   -- after that meeting.

16   Q.   I'm sorry.  We didn't catch that.

17   A.   I never spoke to Mr. Norell until approximately a month

18   after the conversation with his secretary.

19   Q.   So were you talking to other people in his office in that

20   intervening period?

21   A.   No.  I usually spoke to that woman.  Again, I don't

22   remember her name --

23   Q.   Is this --

24   A.   -- on several occasions.

25   Q.   Would the lady's name be Nancy Piloto or do you not recall?

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1    A.   I'll be honest.  I don't remember her name.

2    Q.   Okay.  How many times did you call before you actually got

3    to speak to Mr. Norell?

4    A.   Well, it had to be about a month; and then I finally was

5    mad because I had not -- I had left messages for his office to

6    have him call me on several occasions; and when I had not heard

7    from him, finally I got so mad on the phone that she put him

8    on, again, approximately a month.

9    Q.   Tell us what you said to him in that conversation and tell

10   us what he said to you.

11   A.   Well, I asked him -- I said, Are we going to file a suit

12   against Mr. West and how come it hasn't been filed already.

13   And to be quite honest, I don't think he remembered, you know

14   -- at the time like he didn't know who I was I thought.  And

15   then he put me on hold, and he looked up some paperwork.  And

16   he came back to me and he said, Well, we can file it within a

17   24-hour period.

18   Q.   Did you want to settle or did you want to sue, Richard?

19   A.   Did I want to what?

20   Q.   Did you want to settle this matter or did you want to file

21   a lawsuit?

22        MR. NORELL:  Objection.

23        MR. MAYER:  Well, I mean originally I wanted to just

24   settle the matter.

25   BY MS. HESFORD:

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1  Q.  Did you have that --

2  A.  I, you know --

3  Q.  Did you have that conversation?

4          **THE COURT:**  Hold on.  Hold on.  Go ahead, Mr. Mayer.

5          **MS. HESFORD:**  Go ahead, Richard.  Sorry, Judge.

6          **MR. MAYER:**  The conversation was that Mr. Norell

7  indicated that he would have to file suit.  So I said, Is that

8  the only way you do this; and he said yes.

9  **BY MS. HESFORD:**

10  Q.  Did you have any discussions with Mr. Norell about job

11  prospects and references and such in the future?

12  A.  Well, I had conversations with his entire office about

13  things that -- items such as unemployment compensation to what

14  do I do when I search out another position.  Do I let them know

15  that I worked for Steve West or not.  How would that help me if

16  by doing that and I'm suing them at the same time.

17          And his answer was that by law he can't give you a bad

18  -- you know, he can't say anything bad about you legally unless

19  he has proof that there is something bad to talk about.

20  Q.  Did Mr. Norell tell you that Mr. West could give an honest

21  reference?

22  A.  He told me he can give a reference that was true to who I

23  was.  And as far as I was concerned, I never did anything to

24  have Steve give me anything but an honest and good reference.

25  You know, working for Steve for the time that I did I felt I

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1    did an excellent job.

2    Q.   Did the time come when --

3    A.   So I didn't think --

4    Q.   Sorry.  Go ahead, Richard.

5    A.   So I didn't think there would ever be a problem with

6    reference other than, you know, what would happen.  As far as I

7    remember, Steve never gave me a bad reference.  He just never

8    gave a reference.

9    Q.   That's secondhand knowledge, of course?

10   A.   Right.

11   Q.   Okay.  Did a time come when you and Steve West got together

12   to try and resolve this matter?

13   A.   There was.

14   Q.   Tell the Court about that, Richard, please.

15   A.   Well, it was a very informal meeting with him --

16           THE COURT:  Mr. Mayer, excuse me.

17           MR. MAYER:  -- where we discussed --

18           THE COURT:  Mr. Mayer, can you hear me?  Mr. Mayer?

19           MR. MAYER:  Yes.

20           THE COURT:  This is the Court.

21           MR. MAYER:  Yes.

22           THE COURT:  How did that meeting come about, please,

23   sir?

24           MR. MAYER:  Through a phone call.

25           THE COURT:  By whom to whom?

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1    **MR. MAYER:**  I actually called.  If I recall, Steve

2   called me, left me a message that he wanted to ask me -- and

3   then I called him back.  And we felt it might be a good time to

4   meet at a restaurant and just discuss the matter at hand.

5        **THE COURT:**  Okay.  Go ahead.

6   **BY MS. HESFORD:**

7   Q.  Tell the Court what happened in that meeting, Richard.

8   A.  We sat down, and Steve was very cordial.  He said to me,

9   Rich, you know, we have a very good relationship.  I consider

10  you my friend.  Why is this all happening?  I don't understand.

11  Your attorney never contacted me to try to resolve this

12  situation which we could have resolved in a minute or two which

13  I happened to believe Steve because working with him in the

14  past if there was ever a situation, it was always worked out

15  immediately.

16        So I said, Well, can we work this out.  I mean, you

17  know, I don't want to -- I really can't afford to have this

18  drag on any further.  I'm not collecting any unemployment.  I

19  can't find a job.  Nobody wants to talk to me.  And I really

20  felt very uncomfortable pursuing this any further because I

21  just didn't feel Mr. Norell's office was giving me the right

22  attention at the time.  So Steve and I spoke a little bit

23  further, and we came to an agreement to work it out.

24  Q.  And did you, in fact, enter into a written agreement?

25  A.  Yes.

1  Q.  As far as overtime, is it your position that you were owed

2  any overtime or not?

3  A.  Well, I felt I was owed money.  If you want to use the term

4  "overtime," you know, that's a tricky word for me.  I'm not

5  familiar with the law when it comes to overtime.  So he owed me

6  money which he agreed to pay and he paid it.

7  Q.  Did you work one job or two, Richard, while you were with

8  Steve?

9  A.  Well, it was two different jobs.  One was inside his

10  office; and then one was behind the wheel of his car, his

11  driver.

12  Q.  And the limo company that you drove for, do you know who

13  owns that company?

14          **MR. NORELL:**  Objection.

15          **MR. MAYER:**  No.

16          **THE COURT:**  Hold it.  What's the relevance of that?

17          **MS. HESFORD:**  Judge, it goes to the fact it was two

18  jobs, two companies; and the companies are owned by two

19  different people.

20          **THE COURT:**  Well, the merits of the claim at this

21  point are almost secondary, so I'm going to sustain the

22  objection.

23          **MS. HESFORD:**  Okay, Judge.  Well, the witness didn't

24  know anyway, so....

25          **THE COURT:**  Let's move on.

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1  **BY MS. HESFORD:**

2  Q.  When did you leave Florida and move to New York, Richard?

3  A.  I arrived in New York on the July 4th weekend.

4  Q.  Why did you leave Florida?

5  A.  I was unemployed for a long period of time, and I felt that

6  I could no longer afford to stay there.  And I had an

7  opportunity in New York so I took it.

8  Q.  Where are you living now?

9  A.  Living?

10  Q.  Yeah.

11  A.  In Floral Park, Long Island.

12  Q.  Okay.  And what are you doing for work?

13  A.  I'm driving a yellow cab in New York City.

14  Q.  Is that comparable to driving a limousine like you were

15  doing before?

16  A.  Well, it's two totally different kind of jobs.  I'm more

17  accustomed to the limousine-type work.

18  Q.  What's the difference?

19  A.  It's much more difficult.  It's just a lot harder, and the

20  money's not the same.

21       MS. HESFORD:  I'm sorry.  Judge, the point being that

22  it's our contention that because of the bad advice he got the

23  man couldn't get a reference down here.  He couldn't get a job

24  down here and had to go back to New York to take for want of a

25  better word -- forgive me -- a much worse job than he had down

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1    here.

2              **THE COURT:**  I'll let it go.  Go ahead.

3              **MS. HESFORD:**  Thank you, Judge.

4    **BY MS. HESFORD:**

5    Q.  Richard, as far as the -- you've talked about it somewhat;

6    but as far as the advice that you got from Mr. Norell, was the

7    advice good advice or bad advice from your perspective?

8    A.  I don't think it was good advice at all.

9    Q.  Why?

10   A.  I don't think -- because I don't think I ever had an

11   attorney's advice.

12   Q.  Can you explain that a little bit for the Judge.

13   A.  You know, I don't know what Mr. Norell -- if I had spoken

14   to Mr. Norell from minute one, it might have been totally

15   different advice that I had received.  Talking to a secretary

16   or someone who works in the office, I'm sure that he's scripted

17   something out for them over a time; but, you know, it never

18   comes out I guess the right way.  I just feel that I didn't get

19   attorney's advice so I don't think it was good advice.

20   Q.  Okay.  Is that why you're testifying against Mr. Norell

21   today?

22   A.  Yes.  Again, I felt that I was misled in some areas and I

23   never felt comfortable.  That's why I released him as my

24   attorney.

25   Q.  When did you last speak to him, Richard?

1   A.   I assume -- I think it was about three weeks ago he had

2   called me.

3   Q.   Why did he call you.  Did he tell you?

4   A.   He wanted to go over the information that I signed.  Some

5   kind of affidavits I believe is the word.  And he wanted to

6   know if they were all true or not, everything that I signed.  I

7   said, Listen, I don't have the affidavits in front of me; and I

8   felt very uncomfortable talking to him about legal terms

9   amongst legal matters.  And I didn't think it was the right

10  thing for him to do, so I asked him not to call me any longer

11  and I didn't speak any further.

12  Q.   Did you talk about what job you're doing now in that

13  conversation?

14  A.   No.  But he thought I moved to New Jersey or something, so

15  I corrected him and I told him I moved to New York.

16  Q.   Okay.  Did he ask you whether you were employed or not?

17  A.   No.  We never got into that conversation.

18          **MS. HESFORD:**  Okay.  I have nothing further, Judge.

19          **THE COURT:**  Okay.  Mr. Norell?

20                          **CROSS-EXAMINATION**

21  BY MR. NORELL:

22  Q.   Good afternoon, Mr. Mayer.

23  A.   How are you, sir?

24  Q.   Good.  How many affidavits did you sign in this case?

25  A.   I don't know.  Probably four or five I would think.

October 7, 2011

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1    Offhand I can't say that's a correct number or not, but to my

2    recollection I believe it was four or five.

3    Q.   Okay.  Tell me -- tell me how -- did you type them

4    yourself?

5    A.   Did I hand type them?

6    Q.   Yes.

7    A.   Did I give the information?  Yes.

8    Q.   Okay.  Did you hand type them?

9    A.   No; because I'm not a very good typist.  It would -- I'd

10   still be typing them if that was the case.

11   Q.   Okay.  How is it that they were typed; do you know?

12   A.   Through information that I gave to somebody at Steve's

13   office.

14   Q.   Okay.  And were you there while they were being typed up?

15   A.   On a couple of occasions I was, and maybe on one I was not.

16   Q.   Okay.  And who was present when you signed these

17   affidavits?

18   A.   Myself and the notary, and Steve was there.

19   Q.   Okay.  Do you know who the notary was?

20   A.   Offhand I don't know her name, but she is employed in the

21   building that Steve's office is in.

22   Q.   Okay.  And why were you terminated; do you know?

23   A.   I think the way it came out at the time was because of a

24   possible lawsuit.

25   Q.   Do you remember giving me a letter that you received, a

October 7, 2011

1  termination letter that you received from Steve?

2  A.  I gave you several letters.

3  Q.  You gave me several letters?

4  A.  Yeah.  I had given you several.  Yeah.  I gave you at least

5  three letters if I'm not mistaken.

6  Q.  Okay.  So is it your testimony that you believe that you

7  were terminated because of the filing of this lawsuit?

8  A.  At the time, yes.

9  Q.  That was the reason that Mr. West gave to you?

10  A.  You know, I never got to talk to Steve about it because at

11  the time that he found out about it, about a possible law case,

12  he did not want to talk to me any further at that time until --

13  from what I understood until he spoke to his own attorney.

14  Q.  Okay.  But it's your --

15  A.  So I never got -- I'm sorry?

16  Q.  But it's your understanding that you were terminated

17  because you filed a lawsuit?

18      MS. HESFORD:  Objection; mischaracterizes the

19  testimony, Judge.

20      THE COURT:  Overruled.  You can answer the question,

21  sir.

22      MR. MAYER:  I'll answer it like I answered it a moment

23  ago.  I don't know what the reason was at that particular time.

24  All I know is one day I went to lunch, came back, and I was

25  asked not to come back up into the office.  I had met

1    downstairs with Harvey who was the office manager at the time,

2    and Harvey said that I was terminated.

3    BY MR. NORELL:

4    Q.  And you weren't given a reason at that time; is that your

5    testimony?

6    A.  Harvey didn't give me a reason.

7    Q.  Did he give you a letter?

8    A.  He said, You have to -- he gave me the letter that I gave

9    to you.

10   Q.  Okay.  Do you have -- you don't have a copy of that letter,

11   do you?

12   A.  I do not.

13   Q.  Okay.  Let me just read you the letter and see if it --

14          MS. HESFORD:  Your Honor, if counsel's reading from a

15   letter that's not been provided to the Court, the witness or

16   counsel or the Judge, I object.

17          THE COURT:  If it's being read for the purpose of

18   refreshing his recollection, I will allow it.

19          MS. HESFORD:  Can we ask if we could see it first,

20   Judge?

21          THE COURT:  Sure.

22          MS. HESFORD:  Thank you.

23   BY MR. NORELL:

24   Q.  Mr. Mayer, just to be clear, you do recall receiving a

25   letter when you were terminated, right?

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1  A.  Yes, sir.

2         THE COURT:  That's been asked and answered.  Let's

3  move on.

4         MR. NORELL:  Okay.  I just want to be clear.

5  BY MR. NORELL:

6  Q.  Okay.  It says, Dear Richard.  It's dated February the 8th,

7  2011.  Dear Richard, I reviewed your hours and, again, there

8  are discrepancies.  On Monday you charged for three hours, but

9  you failed to report that you had lunch for at least an hour of

10  that.  On Saturday you were supposed to provide the hours at no

11  charge to Dr. Abalav (sp) because he was providing

12  complimentary prescriptions for you.

13         On Tuesday you put in improper hours indicating you

14  spent three hours going to Dr. Abalav and just picking up a

15  prescription.  As you know, your telemarketing performance has

16  been extremely poor; therefore, we are terminating you with

17  cause wishing you the absolute best in whatever you do.

18         Does that refresh your recollection as to why you were

19  terminated?

20  A.  Yeah.  That was a letter given to me by Harvey, yes.

21  Q.  Okay.  And there's no mention of any lawsuit in there,

22  right?

23         THE COURT:  The letter -- well, go ahead.

24         MS. HESFORD:  Judge, the witness doesn't have the

25  letter.  He's asking him to remember --

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1    MR. NORELL:  Can I -- can I show the witness a

2  document through this TV here?

3    MS. HESFORD:  I doubt it.

4    THE COURT:  I don't think so.

5    MS. HESFORD:  Unless you've made arrangements.

6    THE COURT:  However, he has clearly identified that

7  was the letter.

8    MR. NORELL:  Okay.

9    THE COURT:  Okay?  Let's move on.

10   MR. NORELL:  Okay.

11  BY MR. NORELL:

12  Q.  And, Mr. Mayer, after you were terminated, isn't it true

13  that you and I spoke about a possible retaliation case?

14  A.  Yes.

15  Q.  And didn't you ask me to represent you in that?

16  A.  I did.

17  Q.  And what did I tell you?  Did I tell you that I didn't

18  trust you?

19  A.  No.

20  Q.  No?  I didn't tell you that I couldn't trust you because

21  you settled the case behind my back?  You don't recall that?

22  A.  You're talking about two different occasions.

23  Q.  Okay.  Do you recall me ever telling you that?

24  A.  Listen, we spoke -- you know, just so that I have it clear

25  in my mind, you and I spoke about a month after I visited the

1    first time.  At that time you didn't know who I was; am I

2    correct?

3            **THE COURT:**  With all due respect, Mr. Mayer, you don't

4    -- I know you may not like this, but you don't get to ask the

5    questions.  You need to be answering the questions, sir.

6            **MR. MAYER:**  Well, Judge, in all respect, Judge, if

7    he's going to ask me if he can trust me at the time, then we

8    have to clarify whether he had known me at the time.

9            **THE COURT:**  He gets to ask the questions.  You get to

10    answer them honestly and to the best of your ability, sir.

11            **MS. HESFORD:**  Richard -- if I may, Judge -- I'm going

12    to get to redirect questions afterwards so....

13            **THE COURT:**  That's uncalled for.

14            **MR. MAYER:**  Okay.

15            **THE COURT:**  Go ahead, Mr. Norell.

16            **MR. NORELL:**  Okay.

17            **THE COURT:**  The question coming from the Court, Mr.

18    Mayer, is did you have a discussion with Mr. Norell at any time

19    ever about him representing you in a retaliation claim?

20            **MR. MAYER:**  Well, can you be more specific on what

21    retaliation means.

22            **THE COURT:**  On a claim against I guess it is the

23    defendant for letting you go.

24            **MR. MAYER:**  Yes.

25            **THE COURT:**  Okay.  Now, Mr. Norell, ask the next

1    question.

2          MR. NORELL:  Okay.

3    BY MR. NORELL:

4    Q.   And did you want me to represent you in that, Mr. Mayer?

5    A.   Yes.

6    Q.   Okay.  And let's go back to the money that you received as

7    part of the settlement in this case.  How much did you receive?

8    A.   Approximately $900.

9    Q.   Okay.  And how is it calculated?

10   A.   You'd have to ask Mr. West that.  I don't remember how he

11   calculated it.

12   Q.   Okay.  So is it your testimony that Mr. West calculated it

13   and you did not?

14   A.   He came up with a figure and then presented it to me and

15   whether I agreed with it or not.  That was the way it went,

16   yes.

17   Q.   And you agreed to it?

18   A.   I agreed to it.

19   Q.   Okay.  And when you came to see me or when you came to my

20   office to seek my services, what was the nature of your

21   problem?

22          MS. HESFORD:  Excuse me.  Judge, can we clarify a time

23   frame on that, please, because we've had multiple --

24          THE COURT:  Yes.  You mean when he first came?

25   BY MR. NORELL:

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1  Q.  Mr. Mayer, when you first came to my office to seek

2  representation for your legal issue, what was your legal issue?

3  A.  Overtime hours.  And I also asked a question about a $2 an

4  hour differential that Steve said that I owed back to him.

5  Q.  Okay.  And when did -- did you ever complain to Mr. West

6  about not receiving overtime?

7  A.  No; never did.

8  Q.  No?  You don't remember complaining to him about the

9  overtime and then in response he cut your hourly by $2 an hour

10  on your telemarketing?

11        MS. HESFORD:  Judge, improper speculation on a

12  hypothetical.

13        THE COURT:  Overruled.

14        MR. MAYER:  He never -- the $2 an hour had nothing to

15  do with overtime.

16  BY MR. NORELL:

17  Q.  Okay.  But didn't you request or inquire about being paid

18  overtime prior to the deduction of $2 an hour?

19  A.  No.  When I came -- the way -- Mr. Norell, the way I worded

20  it to you was I came into your office, spoke to your office

21  staff, indicated to them the story of why I was so annoyed.

22  You see, Steve and I never-never spoke about overtime even from

23  the beginning.  Okay?  That's the truth.  He never ever.  We

24  never did.

25        He -- what he did was -- he said, I have a job for

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1   you.  It can run into "X" amount of hours per week.  Are you

2   willing to do that?  The answer was yes.  Then some months

3   later, approximately nine months later, he wanted $2 an hour

4   for the entire time paid back to him.

5           So I got really annoyed.  Then I went to your office.

6   I never spoke to Steve about it.  I went to your office and

7   explained the $2 an hour situation.  And then I said, Well, you

8   know, I've been working for this guy 50 to 60 hours a week on

9   average for the entire time and I never got a penny overtime.

10  The response from your office was, Well, legally he owes it to

11  you.

12  Q.  Okay.  And you recall filling out a client intake form when

13  you came to my office, right?

14  A.  I did fill out some paperwork, yes.

15  Q.  Okay.  And there was a question, Please give a brief

16  explanation of the legal problem or issue.  And you -- do you

17  remember writing nonpayment of overtime?

18  A.  I did.

19  Q.  Okay.

20  A.  Because your office explained to me -- before I filled out

21  that paperwork, your office explained to me how I was entitled

22  to it.

23  Q.  Okay.  So is it your testimony that you didn't --

24  A.  And then I filled out the paperwork.  I'm sorry.  What?

25  Q.  Is it your testimony you did not come to my office because

1  of unpaid overtime?

2          **MS. HESFORD:**  Objection; asked and answered, Judge.

3          **THE COURT:**  Sustained.  Let's move on.

4          **MR. NORELL:**  Okay.

5  **BY MR. NORELL:**

6  Q.  Now, do you recall the date when you first came to my

7  office?

8  A.  It was early February from what I remember.

9  Q.  Okay.  I have a -- I have a client intake form that's dated

10 by you January 17th, 2011.  Does that refresh your memory?

11 A.  Yeah.  I'm sure that's about right.  Yes.

12 Q.  Okay.  And you remember -- do you remember coming back a

13 week later to fill out the rest of the papers?

14 A.  No.

15 Q.  No?  Okay.  Do you know on what date your lawsuit was

16 filed?

17 A.  You know, I don't know the date.  I know that you told me

18 somewhere around February 5th or so it would be filed and that

19 the person who does the giving of the paperwork to Steve West

20 himself had a problem -- had a problem reaching Mr. West.  So I

21 believe that he actually got served around the 9th or 10th, and

22 I believe you filed it probably around the 6th or the 7th maybe.

23 I'm not sure.

24 Q.  Okay.  And you wanted me to file that lawsuit for you,

25 didn't you, Mr. Mayer?

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1   A.  I did.  Yes, sir.

2   Q.  You did.  And you called my office several times because we

3   had not filed a lawsuit yet and you wanted it filed, didn't

4   you?

5   A.  I wanted it filed.  Yes, I did.

6   Q.  Okay.  And isn't it you true, Mr. Mayer, that you told me

7   that I deserve a fee in this case?

8            THE COURT:  That's irrelevant.  Let's move on.  With

9   all due respect Mr. Mayer isn't going to decide whether you get

10  a fee or not.  I am.

11           MR. NORELL:  Okay, Your Honor.  I'm not going to argue

12  with you, but I think it's relevant.

13           THE COURT:  For what reason?  What is his intent?

14           MR. NORELL:  Because he's saying that I got bad --

15  that I gave him bad advice.  And he's also admitted to me that

16  the settlement agreement says that I can get the fees from Mr.

17  West, and he also admitted to me that --

18           THE COURT:  Okay.

19           MR. NORELL:  -- he thinks I should get paid.

20           THE COURT:  I'll let you ask the question.  Go ahead.

21  BY MR. NORELL:

22  Q.  Mr. Mayer, didn't you admit to me that you believe that I

23  should get paid by Mr. West for my time in this case?  Isn't

24  that a fact?

25  A.  Well, you know, I'm not going to answer it the way you're

1    asking it because that's like a trick question to me.  Okay?

2    Here's the answer that you should get:  In my opinion -- well,

3    when I went -- when Steve and I took care of the matter, I told

4    Steve that if there's any repercussions by your office, I don't

5    want to be responsible for them.  And that's the answer that

6    you're going to get from me.  Do I know whether you deserve

7    fees or not?  Just like the Judge said it's up to him, not me.

8              **THE COURT:**  Mr. Mayer, let me ask you a question, sir.

9    I'm not clear on something.  We have established that you

10   talked to Mr. Norell and that you wanted him to represent you

11   on a retaliation claim.  Did that occur --

12             **MR. MAYER:**  Right.

13             **THE COURT:**  -- before you met with Mr. West and

14   settled the matter or afterwards?

15             **MR. MAYER:**  Before.

16             **THE COURT:**  Okay.  Go ahead.  Mr. Norell, anything

17   further?

18             **MR. NORELL:**  Yeah.

19   **BY MR. NORELL:**

20   Q.  So your testimony is that our conversation about me

21   representing you in a retaliation claim happened before you met

22   with Mr. West and settled the case?

23   A.  That's correct.

24   Q.  Okay.  Did I tell you why I wouldn't represent you?

25   A.  This was after the fact.  That's what I was trying to tell

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1   you before.  You see, unless -- retaliation to me means two

2   different things.  What I thought retaliation means is that if

3   I got fired from my job due to a lawsuit, it was illegal and

4   that you could retaliate another claim.

5   Q.  I didn't catch that last part.  Can you just repeat your

6   last half a sentence.  We didn't get it.

7   A.  I thought before Steve West and myself ever worked anything

8   out, you and I or your office had discussions about the word

9   retaliation.  To me that means that if I was fired from my job

10  prior -- you know, due to a lawsuit, that there are retaliatory

11  measures -- you can retaliate in measures of legal whatever

12  that may be.  Now, as far as speaking to you in those terms,

13  that was long before Steve and I ever worked anything out.

14  Q.  Okay.  And did I refuse to represent you in that case?  Yes

15  or no?

16  A.  In what case?

17  Q.  In the retaliation case?

18  A.  I don't know the case you're referring to.

19  Q.  Did I refuse to represent --

20  A.  Say it again.

21  Q.  Did I refuse to represent you in a retaliation claim

22  against Mr. West?  Yes or no.

23  A.  Are we talking after I spoke to Steve or before?

24  Q.  At any time, Mr. Mayer, did I refuse to represent you in a

25  retaliation claim against Mr. West?  Please tell the Court.

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1  A.  No.

2  Q.  So you're testifying --

3  A.  No, you didn't refuse.

4  Q.  Your testimony is I didn't refuse?

5  A.  No, you didn't refuse because -- I don't know when -- I

6  don't know when you're talking about.  Give me a date.

7          THE COURT:  At any time, Mr. Mayer.

8          MR. MAYER:  You know, any -- before I spoke to Steve,

9  the answer was you would represent me in any matter that I

10  needed.  After I spoke to Steve, you didn't want to represent

11  me.  That will answer your question.

12  BY MR. NORELL:

13  Q.  Okay.  Mr. Mayer, was there a time that you called my

14  office and had Mr. West on the phone as well without my

15  knowledge?

16  A.  No.

17  Q.  No?

18  A.  No.

19  Q.  Was there a time that Mr. West called my office and you

20  were on the phone?

21  A.  No.

22  Q.  No?  Okay.

23          THE COURT:  Let's go, folks.  We need to wrap this up.

24  BY MR. NORELL:

25  Q.  Mr. Mayer, were you -- when you first complained about this

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1    wage cut by Mr. West, were you given a week off to think about
2    things?
3    A.   Yes.
4    Q.   Okay.  And what was -- tell me how that happened.
5    A.   Well, the best of my memory I had a meeting with Steve in
6    his office one morning in reference to the monies of $2 an hour
7    amongst other things we spoke about that had nothing to do with
8    money.  We were just in a bad place at the time.  And we felt
9    that perhaps if I took a week off, it would give Steve time to
10   recollect on the situation and give me time to calm my nerves
11   down so that he and I don't get into a confrontation over this
12   whole thing; that maybe things would be said that were
13   unnecessary.  So we felt a vacation apart for a week would be a
14   good thing.
15   Q.   And that happened before we filed a lawsuit, right?
16   A.   Yes.
17   Q.   Okay.  And as part of this settlement that you entered into
18   with Mr. West, he wanted you to dismiss the lawsuit, right?
19   A.   Yeah.  That would be correct, yes.
20   Q.   Okay.  So there was no -- there was no settling the case
21   without dismissing the lawsuit, right?
22           THE COURT:  He's already answered the question.  Let's
23   move on.
24           MR. NORELL:  I have nothing further, Your Honor.
25           THE COURT:  Okay.  Ms. Hesford, do you have any

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1   questions for Mr. Mayer?

2          **MS. HESFORD:**  Yes, sir.

3                    **REDIRECT EXAMINATION**

4   **BY MS. HESFORD:**

5   Q.   Just one, Richard.  I want to follow up on the comment you

6   made about the retaliation when you said that Mr. -- when you

7   asked about retaliation, Mr. Norell didn't know who you were.

8   Can you just explain that for the Judge, please.

9   A.   Well, when I spoke to his office approximately a month

10  after the first meeting -- January 17th, so somewhere, two to

11  three weeks or, you know, I said a month.  Obviously it was a

12  little less time than that.

13          You know, I called his office and said, When is this

14  lawsuit going to be filed.  When is this going to happen?  I

15  can't -- I was having a problem working with Steve at the time.

16  I felt that I needed to get this done.  And that's when Mr.

17  Norell got on the phone, and he didn't know who I was.  I mean

18  that's the way I felt it.  I mean two to three weeks of calling

19  his office, filling out papers, et cetera, and still not

20  knowing who I was and not filing gave me a very empty feeling

21  on who I'm dealing with here.  Like I said in the beginning,

22  most of the advice given to me were from people that were not

23  attorneys.

24  Q.   Okay.

25  A.   Simple as that.

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1   Q.  Richard, thank you for your time.  We appreciate it.

2           **MS. HESFORD:**  Judge, I have nothing further.  Do you

3   have any questions for the witness, sir?

4           **THE COURT:**  Okay.  I have one last question.  When you

5   said -- you just related to us a conversation.  You said you

6   felt it.  Did Mr. Norell say to you, I don't know who you are

7   or did you feel by the tenor of the conversation that you

8   didn't think he knew who you were?

9           **MR. MAYER:**  Right.  Well, you know, he didn't act like

10  he knew me, and he didn't say that he didn't know me.  It was

11  just a feeling in my gut from the way he was talking to me, you

12  know, putting me on hold, giving himself time to look into the

13  matters kind of gave me the feeling that he didn't know who I

14  was and what it was about.

15          **THE COURT:**  All right.  Mr. Mayer, I appreciate your

16  appearing today.  Please go wherever it is you need to go.

17  Thank you, sir.

18          **MS. HESFORD:**  Thank you, Richard.  Good to see you.

19          **MR. MAYER:**  All right.

20          **MS. HESFORD:**  Bye-bye.

21          **MR. MAYER:**  Bye.

22          **THE COURT:**  Okay.  Let's hold on for just a moment.

23  We're on at least mute, correct?

24          **IT TECHNICIAN:**  It's shut off, Judge.

25          **THE COURT:**  Okay.  Defense, do you have any further

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1  evidence, again, other than that which is in the file that you

2  want this Court to consider?

3         MS. HESFORD:  Yes, Your Honor.  I'd like to call Mr.

4  Steven West.

5         THE COURT:  Okay.  Let's have Mr. West take the stand.

6         MS. HESFORD:  Can he stay here or do you need him over

7  there, Judge?

8         THE COURT:  I want him on the witness stand.

9         MS. HESFORD:  Go ahead.  Over there.

10        THE COURTROOM DEPUTY:  It's right over here.

11        THE COURT:  Oh, this is all right.  Well, what the

12  heck.

13        MR. WEST:  Okay.

14        THE COURT:  Let's not be too particular.

15        THE COURTROOM DEPUTY:  Okay.  Raise your right hand.

16                    **STEVEN WEST, SWORN.**

17        THE COURTROOM DEPUTY:  Please state your full name for

18  the record and spell your last name.

19        MR. WEST:  Steven West, W-e-s-t.

20        THE COURT:  Before we begin, if you would be more

21  comfortable sitting over here --

22        MR. WEST:  I'm fine, sir.

23        THE COURT:  Okay.

24        MR. WEST:  Thank you.

25        THE COURT:  Go ahead, Ms. Hesford.

1          MS. HESFORD:  Thank you, Judge.

2                    DIRECT EXAMINATION

3     BY MS. HESFORD:

4     Q.  Steve, you heard testimony from Richard about when you were

5     fired and the circumstances and the lawsuit.  Would you please

6     tell the Judge the chronology of events as you recall them.

7     A.  Yes.  Richard began to act in a funny way.  As he

8     testified, we had a strained relationship, but it became

9     intensified.  His hours were inaccurate.  He actually had a

10    bowel movement in his pants and had to go home.

11          THE COURT REPORTER:  Excuse me.

12          MR. WEST:  Am I going too fast?

13          THE COURT REPORTER:  No.  I can't hear you as well.

14    Speak louder.

15          MR. WEST:  Oh, I'm sorry.  I'll come closer here.  Is

16    that better?

17          THE COURT REPORTER:  Yes.

18          MR. WEST:  He actually had a bowel movement in his

19    pants and had to go home.  He was distracted.  His hours were

20    inaccurate.  And I knew nothing about a lawsuit.  In fact, he

21    was fired on a particular day; and several days thereafter I

22    was served.

23          I knew nothing whatsoever about that lawsuit.  It had

24    to do with us having problems, his uneven performance, and he

25    was clearly distracted.  As part of his role of making phone

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1  calls as a telemarketer, his productivity was reduced by 50

2  percent.  In hindsight I only can believe he was troubled by

3  having to file a lawsuit and be in that office knowing some day

4  I might be served.  In fact I was served several days after he

5  received his written letter which counsel testified was given

6  to him.

7  Q.  Steve, Richard talked about the $2 discrepancy.  Briefly

8  can you explain that for the Judge.

9  A.  Yes.  When Richard was hired originally, it was my

10  perception that both jobs paid the same rate.  Since I did not

11  approve the payroll, when we hired a new comptroller, it was

12  brought to my attention; and I believed it was in error.

13      I suggested to Richard that he would not have to pay

14  it back, but we would subtract it from future commissions.  He

15  and I clearly disagreed about that.  And I, in fact, told him

16  it might be an idea as a friend to take a week off and both of

17  us to think about it.

18  Q.  Tell me how you and Richard came to settle this litigation.

19  Excuse me.  Strike that.  Tell me how you and Richard came to

20  settle your dispute.

21  A.  I had received two phone calls from references for Richard.

22  I was uncomfortable in coming to the phone.  I understood I had

23  the right to make a truthful statement; that there was

24  litigation with Richard.  And I thought it would have an

25  adverse affect with him, and so I called him asking him to

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1    please not use me as a reference because if people continually

2    called me, eventually I would say the fact -- there is

3    litigation and I cannot go any further.

4            Richard then stated, There must be some way we can

5    work this out.  We're supposed to be friends.  I said, Of

6    course we can.  There's not that much money involved in this

7    thing.  Let's sit down and get together.  He may have said,

8    Let's get together; but we met at a restaurant.  And we

9    realized that, in fact, the only money that was owed and it was

10   reflected in the settlement was the last week's pay and travel

11   expenses.  There, in fact, was no overtime that was agreed to

12   or ever considered in the settlement.

13   Q.  Forgive me if this is out of sequence, Steve; but in the

14   course of the multiple filings on the attorney's fees, did you

15   review Mr. Norell's time records?

16   A.  I believe I did.

17   Q.  Do you recall discussions about a 20-minute entry on March

18   the 22nd?

19   A.  Just vaguely.  Honestly I don't have a clear recollection

20   of that.  I do not have a clear recollection of that.

21   Q.  So if you filed an affidavit at the time, you'll stand by

22   the affidavit?

23   A.  Absolutely.

24   Q.  Okay.  If Mr. Norell had approached you at the beginning,

25   what would have happened?

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1     MR. NORELL:  Objection.

2     THE COURT:  Sustained.

3 BY MS. HESFORD:

4 Q.  Have you had other attorney problems similar to this that

5 you've resolved?

6     MR. NORELL:  Objection.

7     THE COURT:  Sustained.

8 BY MS. HESFORD:

9 Q.  Pursuant to the agreement is it correct that you and Mr.

10 Mayer agreed that there was no overtime due?

11     MR. NORELL:  Objection.

12     MR. WEST:  That is correct.

13     THE COURT:  Well, the agreement's in evidence.  The

14 agreement speaks to itself -- for itself.

15     MS. HESFORD:  I don't know if I asked this, Judge.  If

16 I did, I apologize.

17 BY MS. HESFORD:

18 Q.  Did Mr. Norell or anybody at his office ever contact you to

19 try and settle this?

20 A.  No.

21 Q.  Had they done so how would you have responded?

22     THE COURT:  That's been asked and answered.

23     MS. HESFORD:  Okay.  All right.  I don't believe I

24 have anything further at this point, Judge.

25     THE COURT:  Okay.  Cross?  Mr. Norell?

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1          **CROSS-EXAMINATION**

2     **BY MR. NORELL:**

3     Q.  Mr. West, when you got served with a lawsuit, did you call

4     my office?

5     A.  I don't think so, sir.

6     Q.  Okay.  And you mentioned that --

7     A.  But I did call Ms. Hesford.

8     Q.  Okay.  Good.  You mentioned that -- you testified that it

9     was the last week's pay and travel expenses that was ultimately

10    paid to Mr. Mayer, correct?

11    A.  Yes.  As Mr. Mayer testified, it was I who calculated --

12         **THE COURT REPORTER:**  Excuse me.  I can't hear him.

13    **BY MR. NORELL:**

14    Q.  Okay.  And this settlement --

15         **THE COURT:**  Hold it.  Hold it.  Hold it.  Mr. West,

16    you've got to speak into the microphone.

17         **MR. WEST:**  Sure.

18         **THE COURT:**  I know you want to be polite and look at

19    Mr. Norell, but you've got to speak into the mike.

20         **MR. WEST:**  Yes, sir.  I totally understand.  As

21    previously testified, it was I who calculated it and computed

22    it $900 which included a full week's compensation plus

23    out-of-pocket travel and mileage expenses.  There was no

24    calculation of overtime whatsoever.

25    **BY MR. NORELL:**

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1  Q.  Okay.  So his last paycheck would have been from the week

2  before he was terminated which was February the 8th, right?

3  A.  I don't have a recollection, sir.

4  Q.  Well, let me show you this letter that you purportedly

5  signed.  Does this refresh your recollection as to when he was

6  terminated?

7  A.  Yes, sir.  It is not purportedly.  I did sign this letter

8  and; therefore, he would have been paid in the normal course

9  approximately 7 to 10 days after that.  And that payment for

10 that week and I think there was a carry-over of expenses.  Mr.

11 Mayer was also reimbursed for his car use and expenses he laid

12 out.  In the aggregate that tolled to $900.  He and I agreed to

13 that amount, and it included no information whatsoever or

14 agreement as to overtime.

15 Q.  Okay.  So 7 to 10 days away from February the 8th brings us

16 to the middle of February, right?

17 A.  Yes, sir.

18 Q.  Okay.  Why did you withhold his last paycheck and not pay

19 him until late March when you settled the case with him?

20 A.  We were angry at each other, and probably in reflection I

21 shouldn't have done that; but there was a lot of emotion.  This

22 man is a friend of mine.  He's a very nice man.  And it was a

23 tragedy in my judgment that this was allowed to happen.

24 Q.  Okay.  Mr. West, you've been sued before under the Fair

25 Labor Standards Act, haven't you?

1        **MS. HESFORD:**  Objection, Judge.

2        **THE COURT:**  Well --

3        **MS. HESFORD:**  That's a clear attempt to prejudice the

4   Court.  Judge, it's not proper.  This is character evidence.

5        **THE COURT:**  You both seem to think that the merits of

6   the case are a lot more important than I think they are.  Okay?

7   We're dealing about an attorney's fee question.  Certainly

8   regardless of what this Court may opine as to what could've,

9   might've, should've, whether the case should have been settled.

10  If so, for how much or whatever is irrelevant to the

11  determination of these before this Court.

12        You asked a question earlier, Ms. Hesford; and I

13  sustained an objection to it.  I'm going to overrule the

14  objection to this one, and I'm going to allow you to ask again

15  a question that you asked earlier; and I'll get back to that.

16        **MS. HESFORD:**  Well, just so long as you -- as long as

17  you can remember the question, Judge.

18        **THE COURT:**  I can.

19        **MR. NORELL:**  How about -- Judge, how about what if I

20  withdraw the question?

21        **THE COURT:**  Well, I'm still going to let her ask it.

22        **MR. NORELL:**  All right.

23  BY MR. NORELL:

24  Q.  So go ahead and -- you know what?  I'm going to withdraw

25  the question anyway.  Mr. West, what's your real name?

1   A.  My last name is Watstin, W-a-t-s-t-i-n.  I'm a professional

2   writer.  I've written nine books.  And I've used the name West

3   for the last 50 years.

4   Q.  Okay.  And you're also a convicted felon, aren't you?

5           MS. HESFORD:  Objection, Judge.  Unless counsel's

6   going to show that that's relevant and that's within the time

7   frame that's allowed.  I'll move to strike that and sanction

8   counsel as well.

9           THE COURT:  Mr. Norell?

10  BY MR. NORELL:

11  Q.  Sir, have you ever been convicted of a felony?

12          MS. HESFORD:  Judge, I objected and he just continued.

13  I'm sorry.

14          THE COURT:  Mr. Norell, do you know what the time

15  frame is of what you're asking?

16          MR. NORELL:  Yes, I do.

17          THE COURT:  I don't what to know what it is or

18  anything else.  What's the time frame?

19          MR. NORELL:  The time frame is 19 -- hold on one

20  second.  This case was resolved in 1992, Your Honor.

21          THE COURT:  Okay.  Ms. Hesford, do you wish to be

22  heard?

23          MS. HESFORD:  I'd like to see the documents, Judge,

24  please --

25          THE COURT:  Okay.

October 7, 2011

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1    **MS. HESFORD:**  -- that he's referring to.

2    **THE COURT:**  Well, the documents only become relevant I

3    suppose if the witness denies same.

4    **MS. HESFORD:**  Okay.

5    **THE COURT:**  So, Mr. West, if you would answer the

6    question.

7    **MR. WEST:**  That is correct, sir.

8    **THE COURT:**  Okay.  End of discussion.  Mr. Norell?

9    **BY MR. NORELL:**

10   Q.  Mr. West, weren't you -- didn't you plead guilty?

11   **MS. HESFORD:**  Judge, didn't you just say that was as

12   far as he gets to go?

13   **THE COURT:**  It depends on what the conviction was for.

14   If it's a crime as we define it of moral turpitude, that

15   question may be asked.  Otherwise it should not be.

16   **MS. HESFORD:**  I'll object, Judge.  Looking at what

17   they've given me which obviously I've just received, but

18   looking at what the cause was I do not believe that's what

19   we're talking about.

20   **THE COURT:**  Okay.  Well --

21   **MR. NORELL:**  Okay.

22   **THE COURT:**  -- I would suggest, Mr. Norell, before you

23   ask that question, you best be sure you're on solid ground.

24   **MR. NORELL:**  I am, Your Honor.

25   **BY MR. NORELL:**

October 7, 2011

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1   Q.  Mr. West, isn't it true that you pled guilty to fraud,

2   conspiracy to defraud, postal and interstate wire fraud, income

3   tax fraud?  Isn't that true, Mr. West?

4   A.  That is true.  20 years ago.  Yes, sir.

5   Q.  Okay.

6           MS. HESFORD:  Wait a minute, Judge.  I'm sorry.  Isn't

7   it a 10-year limit, not a 20-year limit?

8           THE COURT:  I don't know that there is any

9   hard-and-fast limit and particularly in this hearing which is

10  not bound by the strict rules of evidence.  So let's move on,

11  Mr. Norell.

12          MS. HESFORD:  I'd just like to object for the record,

13  Judge.  My recollection from evidence -- I'm teaching at the

14  law school -- is you get a ten-year limit.  And if it's over

15  ten years, you're not allowed to introduce it.  So I'll move to

16  strike that from the record.

17          THE COURT:  Okay.  I'm going to deny that motion, but

18  let's move on.

19          MR. NORELL:  Okay.

20          THE COURT:  And let me reiterate the strict rules of

21  evidence do not apply to this hearing.  Go ahead, Mr. Norell.

22  BY MR. NORELL:

23  Q.  Mr. West, did you prepare all these affidavits that Mr.

24  Mayer signed?

25  A.  I participated in that as well as Mr. Mayer.

1  Q.  Okay.  Did you sign his name as well?

2  A.  No, sir.

3  Q.  Are you sure?

4  A.  Yes, sir.

5  Q.  Have you ever been accused of forging somebody's affidavit?

6        MS. HESFORD:  Objection, Judge.

7        MR. WEST:  Not that I can --

8        THE COURT:  Sustained.

9        MR. WEST:  Not that I can --

10        MS. HESFORD:  Steve, it's been sustained.

11        THE COURT:  You don't have to answer that, Mr. West.

12        MR. WEST:  Thank you, sir.

13  BY MR. NORELL:

14  Q.  Mr. West, we talked about there being two different jobs

15  that Mr. Mayer had.  One was to be your driver, correct?

16  A.  Technically that's not correct, sir --

17  Q.  Okay.

18  A.  -- in its entirety.

19  Q.  Tell me what two jobs he had.

20  A.  One job was to be a telemarketer; and one job was to drive

21  for many, many people including myself.

22  Q.  Okay.  And who was his employer as the driver?

23  A.  I believe it was Limousine Corporation of America was the

24  technical employer.

25  Q.  Okay.  And who was his employer as a telemarketer?

1  A.  Wall Street Equity Group.

2  Q.  Okay.  And this limousine company, are you an officer of

3  that corporation?

4  A.  No, sir.

5  Q.  No?  Now, when you terminated him, you terminated him

6  because he had reported incorrect hours as a driver, correct?

7  A.  Amongst other reasons, sir, as previously testified.

8  Q.  Okay.  And the letter that you wrote, that you signed, that

9  you just identified as your signature, that's on a Wall Street

10  private Equity Group, Incorporated letterhead, correct?

11       MS. HESFORD:  Objection, Judge.  The document speaks

12  for itself.

13       MR. NORELL:  I'm sorry.

14       MS. HESFORD:  And it says Wall Street Equity Group,

15  Mr. Norell.

16       MR. NORELL:  I'm sorry.  I was looking at a different

17  document.  Am I bad.

18       MS. HESFORD:  And, Judge, in that brief space, if I

19  may, when I asked to see the document, I was given a civil

20  docket sheet.  I was not given anything about a criminal

21  conviction.  Could you please give me the alleged criminal

22  conviction.

23       THE COURT:  It's irrelevant at this point.

24       MS. HESFORD:  I agree, Judge.

25       THE COURT:  Mr. West has already testified to it.

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1    **MS. HESFORD:**  Thank you.

2    **THE COURT:**  Let's move on.

3    **MS. HESFORD:**  That's it?  Thank you.

4    **BY MR. NORELL:**

5    Q.  The letter that you signed, the termination letter for Mr.

6    Mayer was from Wall Street Equity Group, Incorporated, correct?

7    A.  Yes, sir.

8    Q.  Okay.  And that's out of the 1000 West McNab Office?

9    A.  Yes, sir.

10   Q.  And where does the limousine company operate out of?

11   A.  There are more than a dozen companies all operating out of

12   1000 West McNab Road, Pompano Beach, Florida.

13   Q.  Okay.  The limousine company operates out of there too,

14   right?

15   A.  Yes, sir.

16   Q.  Okay.

17   **MR. NORELL:**  I have nothing further, Your Honor.

18   **THE COURT:**  Okay.  Any redirect?

19   **MS. HESFORD:**  Just a couple of questions.  And you

20   also said I could ask a question that you obviously remembered.

21   **THE COURT:**  I always save the best for last.

22   **MS. HESFORD:**  I'll wait until the last thing.

23   **REDIRECT EXAMINATION**

24   **BY MS. HESFORD:**

25   Q.  Just three questions.  First of all, Steve, Mr. Norell said

1    when you got served, did you call his office; and your

2    testimony was you called me.  Did I currently represent both

3    you and Wall Street Equity Group at that time?

4    A.  Yes, ma'am.

5    Q.  Okay.  Actually the third question is the question that

6    you're telling me about, Judge.  The other question is:  The

7    limousine company for which Richard may have worked, who owns

8    that company?

9    A.  Derrick West.

10   Q.  And you have no ownership interest?

11   A.  None whatsoever.

12         MS. HESFORD:  Okay, Judge.  The only other question is

13   whatever you have which I don't remember.

14         THE COURT:  Okay.  You started to ask a question of

15   Mr. West about -- and I can't give it to you verbatim -- about,

16   You've had other cases like this where you had to deal with

17   attorneys.

18         MS. HESFORD:  Yes, sir.  Thank you.

19   BY MS. HESFORD:

20   Q.  Steve, have you had other -- first of all, how long have

21   you been employer either personally or corporately?

22   A.  45 years.

23   Q.  In that 45 years, have you had other disputes if you will

24   with employees?

25   A.  Yes.  There's one particular one that's most relevant to

October 7, 2011

1    this particular matter.

2    Q.  Go ahead.

3    A.  Another employee who was Mr. Mayer's friend, a young lady

4    named Deanna, had some personal problems and retained an

5    attorney to seek out compensation much in a similar mode to Mr.

6    Norell's complaint; but that attorney chose a different path.

7           He called me on the phone and said, It would be a

8    shame for you and this young lady who thinks so well of you to

9    fight with each other.  May I suggest that you get together

10   with her and if you don't resolve it, I'm going to sue the

11   devil out of you; but if you do resolve it, it's in her best

12   interest.

13          We got together.  In 10 minutes we resolved the issue,

14   and she's now very successful in her career and she's not

15   driving a taxicab.

16          MS. HESFORD:  Thank you, Judge.

17          THE COURT:  Okay.  Thank you, sir.  You may be seated.

18          MR. WEST:  Yes, sir.

19          THE COURT:  Any other evidence from the defense?

20          MS. HESFORD:  Other than Your Honor has given us leave

21   to do the notice of filing.  I believe the defense rests.

22          THE COURT:  Okay.  Anything further from the

23   plaintiffs?

24          MR. NORELL:  How much time do we have left, Your

25   Honor.  Five minutes?

October 7, 2011

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1     **MS. HESFORD:**  No.

2     **THE COURT:**  At most.

3     **MS. HESFORD:**  We're out of time according to me,

4     Judge.

5     **MR. NORELL:**  I'm going to rest.

6     **THE COURT:**  Okay.  While I figure out whether I get to

7     do this by report and recommendation or by order -- and I think

8     I do it by order -- but I could be mistaken.  It's going to

9     take me a while to do that.  Unlike what has transpired to date

10    without any fear of recriminations, defense, you might want to

11    sit down and talk to Mr. Norell and see if you can't resolve

12    this matter.

13    **MS. HESFORD:**  We did try, Judge.

14    **THE COURT:**  Okay.  That was before I said what I just

15    said.

16    **MS. HESFORD:**  That's true.

17    **THE COURT:**  We're adjourned.

18    **MS. HESFORD:**  Thank you, Judge.

19    **MR. NORELL:**  Thank you, Your Honor.

20    **THE COURTROOM DEPUTY:**  All rise.

21    **(Concluded)**

22

23

24

25

October 7, 2011

Evidentiary hearing on attorney's fees and reasonable litigation expenses

1                    C E R T I F I C A T E

2

3          I hereby certify that the foregoing is an accurate

4    transcription of proceedings in the above-entitled matter.

5

6
     1/13/11                   /s/ Jill Michelle Hardy-Hobbs
7    -------                   ---------------------------------------
     DATE                      JILL MICHELLE HARDY-HOBBS, CCR, FPR
8                              *OFFICIAL UNITED STATES COURT REPORTER*
                               400 NORTH MIAMI AVENUE, SUITE 08S33
9                              MIAMI, FL  33128    T: 305.523.5022
                               jill_hardy-hobbs@flsd.uscourts.gov
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                              October 7, 2011